[Nos. 39505, 39506.    Department Two.    April 18, 1968.]

THE STATE OF WASHINGTON, *Respondent,* v. RONALD DEAN ROTHENBERGER *et al., Appellants.*[*]

*Henry P. Opendack,* for appellants (appointed counsel for appeal).

*Charles O. Carroll* and *C. N. Marshall,* for respondent.

HILL, J.—Ronald Dean Rothenberger and Samuel Eugene Pernar each appeals from a conviction of second-degree burglary. The appeals were argued together. The burglary occurred late on November 1, or early on November 2, 1966, in Seattle, Washington, and the appellants admit that they were involved in it. They urge, however, that under the rules by which the game of "Cops and Robbers" is presently being played, they are entitled to "get home free."

The sole assignment of error on each appeal is that the trial court failed to grant a motion to suppress "all evidence seized as a result of the unlawful arrest," and "both the oral and taped statements, admissions, and/or confessions by the State Patrol etc. of the State of Oregon" and "any oral or written statements signed or unsigned, admis-

*Reported in 440 P.2d 184.

sions and/or confessions, culpatory or inculpatory; of the defendants and each of them."

The basis for the suppression is that all of the evidence secured is "fruit" from a "poisonous tree," *i.e.,* an unlawful arrest.

Hence, the circumstances of the claimed unlawful arrest become our principal concern on these appeals. Following the burglary, the appellants started driving south in Rothenberger's car. While traveling through the state of Oregon, they were stopped near Salem by Officer Ray Edwards of the Oregon State Police. This was a routine check to determine if the driver was properly licensed to drive a motor vehicle on the highways of the state of Oregon.[1] Pernar, who was driving the car, did not have a driver's license; but Rothenberger satisfied the officer that he was the owner of the car and that he did have a driver's license. Pernar was given a citation for driving without a license, and the appellants continued on their way with Rothenberger driving the car. No search had been made; no information concerning any law violation, except Pernar's driving without a license, was obtained. This is the claimed unlawful arrest.

Shortly thereafter, Officer Edwards learned, as a result of an identification check, that Rothenberger was wanted on a felony charge in Maricopa County, Arizona. This information, after having been transmitted to officers further south in Oregon, resulted in a road block being set up between Albany and Eugene where the Rothenberger car was

---

[1]There is no express statutory authorization for such an action by the Oregon State Police, but it is regularly and routinely done on the authority of a statute which provides:

(1) Every person licensed as an operator or a chauffeur shall write his usual signature with pen and ink in the space provided for that purpose on the license certificate issued to him, immediately upon receipt of such certificate. The license is not valid until the certificate is so signed.

(2) The licensee shall have such license in his immediate possession at all times when driving a motor vehicle, and shall display it upon the demand of a justice of the peace, a peace officer, or a field deputy or inspector of the department. (ORS 482.300)

stopped, and Rothenberger was arrested on the Arizona felony charge; his car was searched, and several items of automotive speed equipment were found. The officers noted a switch-blade knife sticking out of Pernar's pocket, and he was arrested on a charge of carrying a concealed weapon. (He pleaded guilty to this charge and was sentenced in Oregon.)

Both Rothenberger and Pernar made oral and taped admissions and confessions to the Oregon State Police as to their involvement in the Seattle burglary on which the present charge against each of them is based—the automotive speed equipment found in the Rothenberger car being part of the loot from that burglary. There would be no question as to the propriety of these arrests, or the search made or the confessions secured were it not for the claimed illegality of the claimed arrest by Officer Edwards.

No one questions that a police officer, knowing that an individual wanted on a felony charge is traveling down a certain highway, has the duty to transmit that information to those who could arrest the wanted individual. The appellants' complaint is that the officer who caused the information to be transmitted to the arresting officers, would not have acquired the information as to Rothenberger's identity had he not unlawfully stopped the Rothenberger car.

It seems to us that three questions are presented:

1. Did the stopping of Rothenberger's car by Officer Edwards, to check for the purpose indicated, constitute an arrest?

2. If it was an arrest, was it an unlawful arrest?

3. If it was an unlawful arrest, was the information acquired concerning the identity of the individuals and the car they were driving of such a character that it could not be used to cause Rothenberger to be apprehended after the arresting officer learned from an independent source that Rothenberger was wanted on a felony charge?

An affirmative answer to the first and second questions seems to us highly debatable. An affirmative answer to the third seems indescribably silly. All three must be answered

affirmatively before the appellants can prevail on this appeal. Appellants have contented themselves on their appeals with presenting an argument for an affirmative answer to questions 1 and 2. This argument consists in setting forth a 1959 opinion of the Attorney General of the State of Washington which held that a law enforcement officer had, at that time, no authority either statutory or common law, to stop a motorist for the sole purpose of determining whether the motorist had a valid operator's license on his person.

We shall pass the two debatable questions discussed by the Attorney General and the appellants, and assume that there was an arrest and that it was unlawful; and we will base our affirmance of the convictions on a negative answer to the third question.

■ It is our view that Officer Edwards, having discovered from an independent source that Rothenberger was wanted on a felony charge, not only had the right but the duty to pursue Rothenberger and arrest him, if that was practicable, or to get that information to officers who could intercept him.

To illustrate just how ridiculous the appellants' contention is, let us assume that while detaining the appellants on an unlawful arrest, word had come over the radio that Rothenberger and Pernar were wanted for a burglary in Seattle. On appellants' theory, the officer supposedly had no alternative but to touch his hat and say, "Gentlemen, be on your way. I am sorry to have unlawfully detained you." We find neither reason nor judicial precedent for such a change in the rules of the long continued game of "Cops and Robbers."

We cite *D'Argento v. United States*, 353 F.2d 327 (9th Cir. 1965), not as being squarely in point, but as indicating that knowledge and identity of persons and cars obtained from a wrongful arrest may be used to make possible subsequent arrests for other offenses. D'Argento was arrested in Beverly Hills on May 1, 1963. This was an illegal arrest, but at that time he admitted the ownership of the car

which had an Illinois license plate. More than 6 months later certain fur pieces were stolen from an interstate shipment and, as a link in the evidence, it became necessary to establish D'Argento's connection with a car bearing that particular license plate. The officer who made the illegal arrest on May 1, testified as to D'Argento's possession and claim of ownership of the car at the time of that arrest. Answering the objection that it was evidence secured as the result of an unlawful arrest, the court said:

> An illegal arrest may prevent the use of evidence seized for that particular offense for which the arrest was made but the identity of the person, his description, the description of his car and its license number are all matters that are observable to an alert intelligent officer. (p. 333)

To recapitulate: We have here no question of unlawful search and seizure. We have an officer who stops a car to make a routine check as to whether the operator had a driver's license. Had Pernar had a driver's license, the officer probably would never have even learned Rothenberger's name; but Pernar having no license, Rothenberger produced his to establish that someone in the car was entitled to drive it. They proceeded on their way. We have assumed for the purposes of this opinion that this brief detention for a perfectly legitimate purpose constituted an unlawful arrest. The officer had thereby learned the name of Rothenberger, the make of his car, and the license number. When he later learned that Rothenberger was wanted on a felony charge, his knowledge of the identity of Rothenberger and his car led to the lawful arrest of that worthy on a felony charge; and that arrest led to the discovery that Rothenberger and Pernar had committed a burglary in Seattle.

Of the "fruit of the poisonous tree," Mr. Justice Frankfurter, speaking for the court, said in *Nardone v. United States,* 308 U.S. 338, 341, 84 L. Ed. 307, 60 Sup. Ct. 266 (1939):

> Sophisticated argument may prove a causal connection between information obtained through illicit wire-tapping and the Government's proof. As a matter of good

sense, however, such connection may have become so attenuated as to dissipate the taint.

The "poison," if any, which had inhered in the original unlawful arrest was so greatly attenuated by the time and circumstances intervening, when the appellants went to trial for the Seattle burglary, that it had lost its potency, if it ever had any.

Appellants cite no authority to support their contention that the evidence of their connection with the Seattle burglary, including their confessions, should be suppressed under these circumstances. We find none. The convictions are affirmed.

ROSELLINI, HUNTER, and HAMILTON, JJ., and BRADFORD, J. Pro Tem., concur.